Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KELLY B., and K.B., <br><br>          Plaintiffs, <br><br> vs. <br><br> BLUE CROSS BLUE SHIELD of ILLINOIS, <br><br>          Defendant. | COMPLAINT <br><br> Case No. 2:22-cv-00277 - JCB |

Plaintiffs Kelly B. and K.B., through their undersigned counsel, complain and allege against Defendant Blue Cross Blue Shield of Illinois ("BCBSIL") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Kelly and K.B. are natural persons residing in Cook County, Illinois. Kelly is K.B.'s father.

2. BCBSIL is an independent licensee of the nationwide Blue Cross and Blue Shield network of providers and was the insurer and claims administrator, as well as the fiduciary under ERISA for the insurance plan providing coverage for the Plaintiffs ("the Plan") during the treatment at issue in this case.

1

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Kelly was a participant in the Plan and K.B. was a beneficiary of the Plan at all relevant times.[1]

4. K.B. received medical care and treatment at New Haven Residential Treatment Center ("New Haven"). New Haven is a licensed residential treatment facility located in Utah County, Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. BCBSIL denied claims for payment of K.B.'s medical expenses in connection with her treatment at New Haven.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because BCBSIL does business in Utah, and the treatment at issue took place in Utah.

8. In addition, Kelly has been informed and reasonably believes that litigating the case outside Utah will likely lead to substantially increased litigation costs for which he will be responsible to pay, which would not be incurred if venue of the case remains in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

9. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for

---

[1] On December 1, 2019 the Plan's group number was changed. No other substantive changes occurred during the timeframe at issue.

appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### K.B.'s Developmental History and Medical Background

10. From a very young age, K.B. suffered from significant anxiety. She had a negative self-image and suffered from body dysmorphia and obsessive-compulsive behaviors. K.B. enjoyed swimming but due to her struggles with obsessive-compulsion and anxiety, she would almost always arrive about forty-five minutes early even though the pool was about five minutes away.

11. K.B.'s anxiety frequently became severe enough that it would cause her to vomit. K.B. started seeing a therapist around the time that she was in the seventh grade. Although K.B. had previously been outgoing, she became increasingly withdrawn.

12. K.B. became increasingly controlled by irrational compulsions and if, for instance, she felt she needed a certain shade of makeup to complete a set, she would steal to support this habit. On one occasion when K.B. forgot her tennis uniform, she had a severe anxiety attack, broke down, and had to be taken home.

13. K.B. started experiencing depressive episodes as well and began restricting her food intake. K.B. worked out obsessively and meticulously catalogued all the calories she ate every day. K.B. would have the exact same meals day after day. She started meeting with a dietician as well as a therapist focused on the treatment of eating disorders. K.B. was

told to have a certain nutrition drink every day but she would pour it down the sink in secret. K.B. became dangerously underweight.

14. K.B.'s compulsions became increasingly severe, for instance every day she walked home from school she picked up every piece of trash she found and put it in her backpack, she had to go to the bathroom five times between meals, and while there she needed to look in the mirror a certain way. She washed her hands to the point that they became raw, read the last line of every page in a book 25 times, before she could watch a video she had to click and restart it five times, she made her bed repeatedly even if she had just done so, and would spend hours eating a small quantity of strawberries. K.B. would frequently get very little sleep due to how long these behaviors took to complete to her satisfaction.

15. At times, K.B. would break down sobbing because she needed to go to a certain place in the house, for instance upstairs to shower, but she couldn't do so without first performing an elaborate series of ritualistic tasks. This frequently left her paralyzed with anxiety and she was unable to perform even simple tasks.

16. K.B. was hospitalized and was placed on the eating disorder unit for ten days, after which she received outpatient care. K.B. tried sleeping in different rooms of the house in an attempt to disrupt her habits, but was unable to sleep if she didn't completely finish all of the tasks she had assigned to herself, such as opening the bathroom door five times whenever she went in. At times, K.B.'s OCD became so bad that she became unable to even enter the house on her own and had to be blindfolded and carried in.

17. K.B. was briefly treated at the partial hospitalization level of care but it wasn't sufficient to resolve her issues, so she was hospitalized once again for an eight-day period. While in the hospital it was discovered that K.B. performed some actions like taking her pants on

and off to use the bathroom so often and so compulsively that she had bleeding wounds on her hips. K.B. got to the point where she couldn't even turn the page of a book on her own. She described herself as "a shell of a person who was taken over by this demon."

18. Upon release from the hospital, K.B. started attending a partial hospitalization program and meeting with multiple therapists and a dietician weekly, but her ritualistic behaviors continued unabated.

19. If for some reason K.B. was unable to complete one of her OCD rituals she began punishing herself through self-harming behaviors like cutting. K.B.'s urges to cut were particularly strong while she was at school and she often ended up going home early or spending most of her day in the counselor's or nurse's office. K.B. was told that she could not continue attending school without a note from her doctor stating she was not a risk to herself. She stopped going to school, but her behaviors continued in her home environment.

20. K.B. was then admitted to a residential treatment facility in California called Polaris. K.B. made progress at Polaris but continued to exhibit troubling behaviors such as self-harm and suicidal ideation and was transferred to New Haven.

### New Haven

21. K.B. was admitted to New Haven on April 25, 2019.

22. In a letter dated May 9, 2019, BCBSIL denied payment for K.B.'s treatment at New Haven. The letter, signed only by Blue Cross and Blue Shield of Illinois Health Care Management Department, gave the following justification for the denial:

> Per the medical necessity provision of your benefit plan, a medical necessity review has been completed. Based on the information provided, you do not meet MCG care guidelines Residential Acute Behavioral Health Level of Care (Child/Adolescent) Guidelines. For the following reasons: You are not having

thoughts to hurt yourself or others. You are not aggressive or violent. You have no side effects from your medicine. You are not hearing or seeing things that are not there. From the information provided, you can be safely treated in a different setting such as Mental Health Partial Hospital/Day Treatment. No medically necessary days were authorized.

23. In addition, Plaintiffs received a series of Explanation of Benefits ("EOB") statements which stated that the services were eligible for payment, however the allowed amount had been reduced because the billed amount was greater than the amount allowed for this service.

24. On October 21, 2019, K.B.'s mother ("G.B.") appealed the denial of payment for K.B.'s treatment. G.B. wrote that under ERISA she was entitled to certain protections during the appeal process including a full, fair, and thorough review which took into account all of the information she provided using appropriately qualified reviewers and which disclosed their identities, which gave the specific reasons for the adverse determination, referenced the specific plan provision(s) on which the decision was based, and which gave her the material or information necessary to perfect the claim.

25. G.B. accused BCBCSIL of acting arbitrarily and contended that its allowed amounts were determined capriciously with no discernable pattern. G.B. included the following summary of the EOB statements she had received.

| Date of Service | Billed Amount | Allowed Amount | Percentage Allowed |
|---|---|---|---|
| 04/25/2019 | $586.00 | $586.00 | 100.00% |
| 04/26/2019 | $586.00 | $586.00 | 100.00% |
| 04/27/2019 | $586.00 | $586.00 | 100.00% |
| 04/28/2019 | $586.00 | $586.00 | 100.00% |
| 04/29/2019 | $586.00 | $356.00 | 61.00% |

| 04/30/2019 | $586.00 | $0.00 | 0.00% |
| 05/31/2019 | $586.00 | $450.00 | 77.00% |

26. G.B. pointed out that the amount billed for K.B.'s treatment never changed, but the amount BCBSIL authorized did change, seemingly without reason.

27. G.B. also noted that BCBSIL had assessed multiple $1,000 preauthorization penalties. She wrote that this done despite the fact that preauthorization was sought (albeit denied) and argued that the penalty was assessed improperly, as the $1,000 penalty was meant to apply to the entire treatment period and was not meant to be applied to each claim. She wrote that BCBSIL could not arbitrarily reinterpret the terms of the insurance policy to apply penalties on a per claim basis.

28. Further, G.B. contended that BCBSIL could not claim that preauthorization was necessary when it paid for portions of K.B.'s treatment, even if some of these payments were later withdrawn.

29. G.B. argued that the "Residential Acute Behavioral Health Level of Care" criteria utilized by BCBSIL violated generally accepted standards of medical practice. She referenced several court decisions in which the courts found criteria which were very similar to those used by BCBSIL to violate generally accepted standards of medical practice.

30. G.B. identified several aspects of these criteria which the courts had called out as deficient, including the requirement of acute level symptoms for a sub-acute level of care, ignoring the recommendations of treating providers and basing the decision on a file review alone, cherry-picking evidence to support a predetermined conclusion, forcing an individual into a lower level of care without regard to whether such treatment would be

effective, failing to address the unique needs of children, approving or denying treatment based on a list of prerequisites, and failing to account for the treatment of co-occurring conditions.

31. G.B. contended that the criteria utilized by BCSBIL were similarly problematic, most especially in their requirements of acute level symptoms for a non-acute level of care.

32. She pointed out that these criteria not only contained the word acute in their name but K.B.'s treatment had also clearly been denied based on acute factors like no thoughts of harm to self or others, no violent behaviors, and no hallucinations. She wrote that this was a non-quantitative treatment limitation and was prohibited by MHPAEA. G.B. asked BCBSIL to rely on the language of her insurance policy rather than proprietary criteria.

33. G.B. stated that BCBSIL had approved small portions of K.B.'s treatment despite the fact that K.B. presented no acute level of distress during these dates. G.B. argued that BCBSIL could not approve some care when no acute symptoms were shown and then simultaneously deny the remainder of care because no acute symptoms were shown.

34. G.B. stated that according to peer-reviewed literature, the most appropriate environment for an individual exhibiting acute level symptoms like a danger to self or others was inpatient hospitalization, and in fact this literature stated that, "[t]he most common reason for [hospital] admission is behavior felt to place the child or others in danger." G.B. included copies of this peer reviewed literature with the appeal.

35. G.B. wrote that in the case of intermediate level medical or surgical treatment, BCBSIL either used no specific criteria as in the case of skilled nursing care or used less restrictive criteria with no acute level requirements such as for cognitive rehabilitation. G.B. reminded BCBSIL that MHPAEA prohibited such disparate treatment and requested that

it perform a parity analysis on the Plan to ensure compliance with MHPAEA. She asked

BCBSIL to forward her the results of this analysis as well as any documentation used.

36. G.B. reiterated that K.B.'s residential treatment was recommended by her treatment team

and other levels of care including inpatient hospitalizations, partial hospitalizations, and

intensive outpatient programs had not resulted in any sustainable treatment gains.

37. G.B. included various letters of medical necessity with the appeal. In a letter dated June

7, 2019, Kristin Condon, PsyD., wrote in part:

> I am writing this letter to provide my strongest professional support of the medical necessity for residential treatment programming for [K.B.] (DOB: [redacted]). I am the Licensed Clinical Psychologist who has provided individual outpatient psychotherapy for [K.B.] spanning April 2015 through March 2019. Throughout the course of [K.B.]'s treatment, even intensive outpatient psychotherapy sessions proved insufficient to monitor and safely manage [K.B.]'s increasing symptoms of severe anxiety, agitated depression, self-injurious behaviors, and disordered eating. Despite intensive rotations through both inpatient hospital and partial hospitalization programs and a multidisciplinary team of outpatient professionals, [K.B.]'s symptoms profoundly worsened in less restrictive treatment settings, resulting in an increase in self-injury and a steady exacerbation of her depressive and anxious symptoms. Less intensive treatment settings also risked a resurgence in [K.B.]'s historic severely restrictive eating patterns, increasing her risk for significant physical injury.
>
> Given the intensity, severity, and progression of [K.B.]'s clinical presentation, including those related to self-self-injury [SIC] and risk of harm, she requires a higher level of care in a more intensive treatment setting. A residential treatment facility is necessary to both monitor and safely manage the constellation of high-risk symptoms [K.B.] is navigating. As a long-time clinician working closely with [K.B.], I consider this to be a medically necessary treatment plan.

Colleen Watson, LCPC, wrote in part in an undated letter from June of 2019:

> By the February of 2019, [sic] [K.B.] was frequently unable to attend school due to crippling anxiety and self-harm behaviors. [K.B.]'s condition had continued to deteriorate to the point that I determined that I could no longer help her. I recommended that [K.B.] seek a higher level of care and a more intensive course of treatment. I understand that [K.B.] admitted to Polaris RTC in March 2019. In a follow up communication with her family, I learned that the setting was not working for [K.B.] and she was having more and more trouble when I again voiced my support for a higher level of care, and when [K.B.]'s parents

mentioned Polaris's recommendation for long term residential at New Haven I was fully supportive of this recommendation.

I have read Insurance's reasons for denying [K.B.]'s coverage for New Haven RTC. I do not agree that [K.B.] could have been effectively treated in a setting less restrictive than a residential program because [K.B.] had already tried outpatient therapy, IOP, PHP and inpatient and it didn't help her. If [K.B.] was too debilitated to attend school and stay behavior free with regular appointments with me and/or Dr. Condon (psychologist), and Dr. Ava (Psychiatrist) how would she have been able to attend another non-residential program?

[K.B.] was forced to take a leave from school because of her mental illness. She was actively self-harming and her ritualistic symptoms of OCD were becoming more and more debilitating. [K.B.]'s family worried about her safety in the home, and felt they could no longer prevent her from potentially injuring herself.

In my opinion, a residential treatment program was the logical next step for [K.B.]. The fact that [K.B.] has finally begun to turn the corner and is after years of unsuccessful treatments finally beginning to lead a life approximating that of her peers is proof the decision was medically and clinically justified and necessary.

Katherine Abdelkerim, MS, LMFT, wrote in part in a letter dated July 12, 2019:

It is our team's recommendation at this time that [K.B.] attend a long-term residential treatment program to gain deep exposure and learning to behavioral skill building to be able to help herself restructure and reframe her thinking so she is able to use behavioral coping tools to self-regulate her emotions independently. When emotionally dysregulated, [K.B.] experiences an increase in OCD behaviors (intrusive and obsessive thoughts of fear of weight gain and negative thoughts to restrict food intake) and self-harming behaviors (cutting, restricting food intake that impair her ability to function. …

[K.B.] is also secretive with warning signs due to people pleasing behaviors, especially with her parents since she has difficulty tolerating her negative emotions and has difficulty expressing her own feelings. [K.B.] tends to use distraction and attempts to change the topic of the conversation due her [SIC] being highly conflict avoidant, which indicates that [K.B.] is unable to maintain safety at home; therefore, all these factors place [K.B.] at a high risk for relapse potential. She will require a contained and structured long-term residential program in order to maintain safety.

In a Psychological Assessment dated April 4, 2019, Abby Jenkins, Ph.D., wrote in part:

Results of current testing reveal [K.B.] continues to exhibit many concerning mental health symptoms. First, [K.B.] remains highly socially anxious and

uncomfortable. She has persistent fears of how others perceive her and she is prone to avoid social relationships for fear of being criticized or rejected. Currently, her worries appear predominantly social in nature. As such a diagnosis of **Social Anxiety Disorder** is indicated.

Next, though it appears [K.B.]'s depression has diminished somewhat, she continues to experience significant symptoms of major depression, including ongoing suicidal thoughts (though she denied current plans or intent). A diagnosis of **Major Depressive Disorder, Recurrent, Moderate** is indicated.

[K.B.] continues to exhibit clinically significant symptoms of OCD. During testing, she was observed to tap and crack her wrist in sets of five. She became clearly uncomfortable when she got a stain on her skirt and asked to change clothes before continuing testing. She was perfectionistic in her response style and typically sacrificed speed for accuracy. Per her current therapist, [K.B.] continues to exhibit numerous and time-consuming obsessions and compulsions. A diagnosis of **Obsessive-Compulsive Disorder** is indicated.

Finally, though [K.B.] does not appear to be significantly restricting her calorie intake currently, she continues to engage in highly selective and ritualistic eating behaviors. Per her current therapist, [K.B.] initially struggled to snack on anything other than almonds and she struggled with anxiety during meal times. Though she has gradually expanded her range of foods to include granola bars, fruit, and dark chocolate, she remains highly resistant to eat sugary foods for fear of gaining weight. She is just now beginning to allow herself treats, though she has recently chosen to eat a vegetarian diet. Current test results suggest she remains concerned about her weight and uncomfortable in her body. She remains at high risk of relapse outside of a structured treatment setting. A diagnosis of **Anorexia Nervosa, in Partial Remission,** is indicated.

In summary, [K.B.] appears to be benefitting from her treatment at Polaris, but continues to struggle with several significant clinical issues, as described above. Given the severity of these issues, the following recommendations are made:

## Recommendations

1. Following her stay at Polaris, it is imperative [K.B.] go on a longer-term residential therapeutic program that can continue addressing each of the above issues in depth. A program that emphasizes a structured, yet supportive culture and relational approach will help ensure [K.B.]'s personal safety and health and will continue to teach her skills to better cope with her symptoms of depression and anxiety. Such a program will also help [K.B.] learn how to form and foster healthy relationships and develop a healthier and more secure sense of self.

2. [K.B.]'s symptoms of depression, anxiety, and OCD, along with her disordered eating behavior, are clinically significant and necessitate 24/7 supervision and therapeutic support to maintain her personal safety. [K.B.] has

not yet acquired the skills necessary to function successfully in a less restrictive environment, such as a public school or non-therapeutic school setting. She requires placement in a residential therapeutic program that can provide intensive therapy and round-the-clock support. Her emotional (and potentially physical) well-being would most certainly deteriorate quickly were she to move to a lower level of care at this time. (emphasis in original)

38. G.B. asked on what basis BCBSIL disagreed with the medical professionals who had treated K.B. on a first-hand basis and had personally witnessed the severity and deterioration of her symptoms. G.B. stated that the treatment at New Haven was necessary to safely and effectively treat K.B.

39. G.B. also included a copy of K.B.'s medical records with the appeal. These records showed that K.B. continued to struggle with purging, food refusal, medication refusal, intrusive thoughts, anxiety, continued compulsions, feelings of apprehension, guilt, and "a pattern of severe impairment" even while in the secure environment of a residential treatment center.

40. G.B. asked in the event BCBSIL upheld the denial that it provide her with the specific reasons for the determination along with any corresponding supporting evidence, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized to evaluate the claim, any mental health, substance use, skilled nursing, inpatient rehabilitation, or hospice criteria used to administer the Plan, any reports or opinions from any physician or other professional regarding the claim, and the names, qualifications, and denial rates of all individuals who reviewed or were consulted about the claim. (collectively the "Plan Documents")

41. In a letter dated November 13, 2019, BCBSIL upheld the denial of payment for K.B.'s treatment. An unidentified psychiatrist offered the following justification for the denial:

Per the medical necessity provision of your benefit plan, a medical necessity review has been completed. Based on the information provided, you do not meet MCG Care Guidelines Posttraumatic Stress Disorder[2], Child or Adolescent: Residential Care (B-010-RES) 22nd Edition for the following reasons: You were not a danger to yourself. You were not a danger to others. You were not manic. You were not psychotic. You were medically stable. You had supportive family. There were Partial Hospitalization programs available in the area. You did not require 24 hour care. From the information provided, you could be safely treated in a different setting such as Mental Health Partial Hospital/Day Treatment. No medically necessary days were authorized.

42. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

43. The denial of benefits for K.B.'s treatment was a breach of contract and caused Kelly to incur medical expenses that should have been paid by the Plan in an amount totaling over $100,000.

44. BCBSIL failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of G.B.'s request.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

45. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as BCBSIL, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

46. BCBSIL and the Plan failed to provide coverage for K.B.'s treatment in violation of the

---

[2] It is unclear why the reviewer utilized guidelines for Post-traumatic Stress Disorder to assess the medical necessity of K.B.'s treatment, as they presumably do not apply to an individual with a primary diagnosis of an eating disorder and obsessive compulsive disorder.

express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

47. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

48. The denial letters produced by BCBSIL do little to elucidate whether BCBSIL conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. BCBSIL failed to substantively respond to the issues presented in G.B.'s appeal and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

49. In addition, BCBSIL relied on criteria which do not appear to apply to K.B. to deny payment, and as G.B. pointed out, BCBSIL engaged in other practices such as arbitrarily reducing the amounts it paid and reassessing a preauthorization penalty in spite of having no authority to do so according to the terms of the insurance contract.

50. BCBSIL and the agents of the Plan breached their fiduciary duties to K.B. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in K.B.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of K.B.'s claims.

51. The actions of BCBSIL and the Plan in failing to provide coverage for K.B.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

**SECOND CAUSE OF ACTION**

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

52. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of BCBSIL's fiduciary duties.

53. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

54. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

55. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

56. The medical necessity criteria used by BCBSIL for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical

necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

57. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for K.B.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does BCBSIL exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

58. When BCBSIL and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. BCBSIL and the Plan evaluated K.B.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

59. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, BCBSIL's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that K.B. received. BCBSIL's improper use of acute inpatient medical necessity criteria is revealed in the statements in BCBSIL's denial letters such as "You are not having thoughts to hurt yourself or others. You are not aggressive or violent. You have no side effects from your medicine. You are not hearing or seeing things that are not there."

60. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that K.B. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

61. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

62. BCBSIL's criteria are so entangled with the application of acute level factors for a non-acute level of care that they refer to themselves as acute level criteria in their name.

63. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

64. A helpful exercise to visualize why BCBSIL's denial was inappropriate is to invert the denial rationale and see what BCBSIL claims it would have paid for. Through its criteria and denial letter language, BCBSIL claims that residential treatment is appropriate for an individual who is harming themselves or others, who is aggressive and violent, who is experiencing side-effects from their medicines, and who is having visual and auditory hallucinations.

65. Residential treatment centers are not equipped nor expected to handle treatment of such

individuals. G.B. provided peer-reviewed literature which showed that the appropriate treatment environment for individuals with acute symptoms such as these is inpatient hospitalization.

66. Additionally, BCBSIL failed to take into consideration the patient's safety if she returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

67. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

68. G.B. provided letters of medical necessity from K.B.'s treatment providers expressing serious concern for K.B.'s wellbeing and ability to stay safe if she were to be discharged prematurely. K.B.'s history corroborates this and shows that her food refusal, obsessive compulsive habits, and self-harm posed grave risks to her safety and ability to live a normal life. In the medical or surgical realm BCBSIL does not discharge individuals when it is not safe or appropriate to do so.

69. In addition, G.B. pointed out that in the case of analogous medical or surgical care, BCBSIL often either used no criteria at all or utilized criteria with requirements that were significantly less restrictive than its residential treatment criteria. Restricting the availability of residential treatment care through the use of criteria which are more difficult to satisfy is a non-quantitative treatment limitation which is prohibited by MHPAEA.

70. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and BCBSIL, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

71. BCBSIL and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that BCBSIL and the Plan were not in compliance with MHPAEA.

72. The violations of MHPAEA by BCBSIL and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendant violate MHPAEA;

(b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan as a result of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendant from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiffs for their loss arising out of the Defendant's violation of MHPAEA.

73. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for K.B.'s medically necessary treatment at New Haven under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 22nd day of April, 2022.

By     s/ Brian S. King
             Brian S. King
             Attorney for Plaintiffs

County of Plaintiffs' Residence:
Cook County, Illinois.